UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE ) | |
| ) | Bankruptcy Case |
| MARILOU L. ECLE KEES, ) | No. 16-62660-tmr7 |
| ) | |
| ) | MEMORANDUM OPINION |
| Debtor. ) | |

This matter comes before the Court on the Chapter 7 Trustee's Objection to Debtor's Claimed Exemption of an individual retirement annuity under 11 U.S.C. § 522(d)(12). After briefing the issues, the parties agreed to have the matter resolved on the record as submitted. For the reasons outlined below, Trustee's Objection is overruled and the exemption is allowed.

<u>Factual and Procedural Background</u>

Through their memoranda and accompanying exhibits, the parties presented the facts they each deem necessary for the Court to resolve the dispute. Because neither party objected to the evidence presented by the other, the Court treats all factual assertions and exhibits as established by stipulation.

Debtor and her former husband divorced in 2011. The General Judgment of Dissolution signed August 8, 2011 (Judgment), awarded Debtor 50% of her husband's Asante Retirement and Trust account as well as 58% of his Asante 403(b) account. The parties do not dispute that the former husband's retirement accounts were properly tax-qualified. The Judgment specified that Debtor was to designate where she wanted her portions of the retirement accounts to be deposited. It also stated that the associated transfers to

MEMORANDUM OPINION -1

Debtor would be non-taxable as provided under 26 U.S.C. § 408(d).[1] Although the parties did not present evidence regarding when the post-divorce transfers occurred, the letter dated July 14, 2017, from Melanie Madden at Futurity First Insurance Group, Inc., establishes that Debtor's portions of her husband's retirement accounts were transferred into 401(k) and 403(b) accounts with TransAmerica Retirement Solutions Corporation (TransAmerica) pursuant to the Judgment.

On March 16, 2015, Debtor applied to American Equity Investment Life Insurance Company (American Equity) for the purchase of a Flexible Premium Deferred Annuity (the IRA). She elected to have it treated as a traditional individual retirement account for tax purposes and specified that the method of purchase would be from a rollover of an existing retirement account with a stated value of $84,300. On March 27, 2015, American Equity issued the Flexible Premium Deferred Annuity Contract (IRA Contract), which lists a total initial premium payment of $84,915.15. The funds were transferred directly to American Equity from TransAmerica, which subsequently issued two Form 1099-Rs for that year showing $84,915.15 in total distributions, none of which was taxable. Debtor has made no further contributions to the IRA.

Debtor filed her Chapter 7 petition on September 11, 2016. On her Amended Schedule B, filed June 28, 2017, she lists a "qualified IRA" with a value of $84,000. She claimed an exemption for the full amount pursuant to 11 U.S.C. § 522(d)(12). Trustee's timely-filed Objection to Claimed Exemption asserts that the IRA "is not a qualified annuity under § 408 of the Internal Revenue Code" and, thus, cannot be exempted under 11 U.S.C. § 522(d)(12). More specifically, Trustee argues that the IRA does not satisfy § 408(b) because: (1) a portion of the IRA is forfeitable; (2) the IRA is assignable or transferrable; and (3) the initial premium amount of $84,915.15 exceeded the $6,000 limitation imposed by § 219(b)(1)(A).

## Jurisdiction

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) stemming from the bankruptcy case.

---

[1] Unless otherwise noted, all subsequent statutory references are to the Internal Revenue Code (IRC), Title 26 of the United States Code.

MEMORANDUM OPINION -2

Burden of Proof

Federal Rule of Bankruptcy Procedure 4003(c) specifies that the objecting party has the burden of proving that the debtor is not entitled to a claimed exemption. The objector must show by a preponderance of the evidence that the debtor has not properly claimed the exemption. *Kelley v. Locke (In re Kelley)*, 300 B.R. 11, 17 (9th Cir. BAP 2003). A claimed exemption is "presumptively valid." *Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029 n.3 (9th Cir. 1999). The objecting party has the burden to produce evidence to rebut the presumption. *Id*. If rebutted, the burden then shifts to the debtor to produce "unequivocal evidence to demonstrate that the exemption is proper. The burden of persuasion, however, always remains with the objecting party." *Id*. (internal citations omitted).

Applicable Law

Our analysis begins with the statutory language. Debtor claims an exemption in the IRA under 11 U.S.C. § 522(d)(12), which provides, in relevant part, that a debtor may exempt "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section . . . 408 . . . " of the IRC.[2] More specifically, 11 U.S.C. § 522(b)(4)(C) provides that a direct transfer of retirement funds from one account that is "exempt from taxation under section 401, 403, . . . [or] 408 . . . " of the IRC shall not cease to be exempt under 11 U.S.C. § 522(d)(12) by reason of such transfer. Stated more simply, direct transfers from one tax-exempt account to another are exempt under § 522(d)(12) of the Bankruptcy Code. *See Mullen v. Hamlin (In re Hamlin)*, 465 B.R. 863, 875 (9th Cir. BAP 2012) (inherited IRA remains exempt after transfer).

The relevant portions of § 408 are as follows:

> (b) **Individual retirement annuity**.—For purposes of this section, the term "individual retirement annuity" means an annuity contract . . . issued by an insurance company which meets the following requirements:
> (1) The contract is not transferable by the owner.
> (2) Under the contract—

---

[2] Although 11 U.S.C. § 522(d)(12) lists numerous sections of the IRC under which a fund or account may be exempt from taxation, Debtor asserts only that the IRA is exempt from taxation under § 408. The Court, therefore, restricts its analysis to that section.

MEMORANDUM OPINION -3

>                (A) the premiums are not fixed,
>                (B) the annual premium on behalf of any individual will not
>                exceed the dollar amount in effect under section 219(b)(1)(A), and
>                (C) any refund of premiums will be applied before the close of
>                the calendar year following the year of the refund toward the
>                payment of future premiums or the purchase of additional
>                benefits.
>        . . .
>        (4) The entire interest of the owner is nonforfeitable.
>        . . .
>        (d)(3) **Rollover contribution** . . . [is defined as]:
>                (A) . . . any amount paid or distributed out of an individual
>                retirement account or individual retirement annuity to the
>                individual for whose benefit the account or annuity is
>                maintained if—
>                        (i) the entire amount . . . is paid into an
>                        individual account or individual retirement
>                        annuity. . . not later than the 60th day after the
>                        day on which he receives the payment or
>                        distribution; or
>                        (ii) [inapplicable].
>        . . .
>        (d)(6) **Transfer of account incident to divorce**.—The transfer of an individual's interest in an individual retirement account or an individual retirement annuity to his spouse or former spouse under a divorce or separation instrument . . . is not to be considered a taxable transfer made by such individual notwithstanding any other provision of this subtitle, and such interest at the time of the transfer is to be treated as an individual retirement account of such spouse, and not of such individual. Thereafter such account or annuity for purposes of this subtitle is to be treated as maintained for the benefit of such spouse.

Section 219(b)(1)(A) and, by extension, § 219(b)(5) fix the maximum annual amount that an individual is allowed to deduct from her taxable income for qualified retirement contributions. The parties agree that, given Debtor's age at the time she applied for the IRA, the operative amount under §§ 219(b)(1)(A) and 408(b) is $6,000.

Discussion

**Forfeitability**

Trustee first argues that the IRA fails to satisfy § 408(b)(4) because it does not provide that Debtor's entire interest is nonforfeitable for the term of the annuity. She analyzes the Cash Surrender Value

MEMORANDUM OPINION -4

provisions (Sections 6.2 and 8.1 of the IRA Contract) to mean that "irrespective of whether the annuity contract has matured, 12.5 percent of the annuity is forfeitable and, therefore, . . . fails to comply with Section 408(b)(4)."[3] Debtor counters by asserting that the Cash Surrender Value language should not be conflated with forfeitability under § 408(b)(4). In order to resolve the issue, the Court must determine whether the 12.5% surrender charge imposed under the IRA Contract for early withdrawal or termination constitutes a forfeiture under the statute.

The answer turns on the definition of "nonforfeitable" as it is used in § 408(b). Section 408 does not define the term. That section was enacted as part of the Employee Retirement Income Security Act (ERISA), with the purpose of protecting the interests of beneficiaries in pension plans. *U.S. v. Infelise*, 159 F.3d 300, 303 (7th Cir. 1998). Congress defined "nonforfeitable" in Title I of ERISA as follows:

> The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, *which is unconditional, and which is legally enforceable against the plan*. . . .

29 U.S.C. § 1002(19) (emphasis added).

The Supreme Court has also weighed in on the term in the context of ERISA:

> The term "forfeiture" normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights. . . . It is therefore surely consistent with the statutory definition of "nonforfeitable" to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect.

*Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 372-73, (1980) (analyzing "nonforfeiture" under 29 U.S.C. § 1002(19)). In *Nachman Corp.*, the issue before the Court was whether a pension plan provision that limited vested benefits to amounts available for distribution from the fund prevented such plan from being characterized as "nonforfeitable" under the relevant provision of ERISA. 446 U.S. at 362. In ruling that such a limitation did not prevent a finding of nonforfeitability, the Court reasoned that the terms "vested" and "nonforfeitable" should be used synonymously in this context and that otherwise vested

---

[3] TRUSTEE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OBJECTION TO EXEMPTION at 3 (Doc. #48; filed 6/22/17).

MEMORANDUM OPINION -5

benefits are still vested – and therefore nonforfeitable – notwithstanding the possibility that the ultimate benefit amount might be less than expected. *Nachman Corp.*, 446 U.S. at 376-78. In addressing any question of whether the Supreme Court's synonymization of "vested" and "nonforfeitable" applies to § 408(b), the Seventh Circuit resolved the matter in the affirmative. *U.S. v. Infelise*, 159 F.3d at 304 (ruling that "the word 'nonforfeitable' as used in § 408(b) refers to a requirement that an individual retirement annuity must be vested in the owner").

In support of her position, Debtor cites *In re Dunn*, 5 B.R. 156 (Bankr. N.D. Tex. 1980). In *Dunn*, the debtor owned an individual retirement account valued at $1,888 with Lubbock National Bank, which served as trustee for the account. *Id*. at 158. He was also in debt to the Bank for a loan in the original amount of $22,000, which was secured by other property owned by the debtor. *Id*. After the debtor filed bankruptcy, the bank sought to claim an interest in the account. *Id*. In resolving the matter in the debtor's favor, the court first explained the common law principal that a bank's fiduciary obligations as trustee of a retirement account predominate over any debtor-creditor relationship with the beneficiary. *Id*. It then discussed the codification of that common law principal in the nonforfeitability provision of § 408(a)(4)[4] of the IRC. *Id*. It ruled that penalties imposed by the IRS for early withdrawals do not violate the nonforfeitability requirement. *Id*. Rather, the nonforfeitability requirement means that the retirement account cannot be forfeited to the bank and that the custodian is precluded from asserting any claim to the assets. *Id*. The *Dunn* opinion, decided less than two months after *Nachman Corp.*, does not reference the Supreme Court's opinion or discussion on vesting. It does, however, harmonize with the Court's conclusion that nonforfeiture pertains to the quality of a person's right to a retirement benefit.

With this in mind, we turn to Section 3.7 of the IRA Contract, which provides that, before the maturity date, the Cash Surrender Value is "always nonforfeitable." Cash Surrender Value is defined in

---

[4] IRC § 408(a)(4) requires that "[t]he interest of an individual in the balance of his account is nonforfeitable." Although § 408(a)(4) is phrased somewhat differently than § 408(b)(4), Congress's use of "nonforfeitable" in successive subsections indicates that the term should be applied in the same manner for each.

MEMORANDUM OPINION -6

Section 6.2 as being equal to *the greater of*: (1) the Accrued Premiums minus applicable Surrender Charges, plus the vested portion of the Accrued Bonus; *or* (2) the Minimum Guaranteed Surrender Value.[5] Section 1.1 also specifies the Surrender Charge, Penalty Free Withdrawal, and Bonus Vesting Percentages that apply depending on when the owner elects to withdraw from or surrender the annuity. That Section also specifies "Nonforfeiture Values: The nonforfeiture values for this Contract equal: 87.50% of all Premiums, less all Withdrawal Amounts, accumulated at the nonforfeiture rate of 1.00%." Moreover, the June 27, 2017, letter from Jennifer Henter, Service Specialist for American Equity, provides, in part:

> The Maturity Date and the Out of Surrender Date are not one in the same. The Out of Surrender Date is the period of time that was agreed upon at application and purchase. This period of time is known as the surrender charge period during which the owner of the contract agrees to the withdrawal provisions as outlined in the contract, specifically the product disclosure. Any withdrawals outside of the provisions would result in a surrender charge being applied. *The surrender charge period on this contract ends after March 27, 2025 at which time the contract value is available for withdrawal without surrender charges*.

(emphasis added.)

Nothing in the IRA Contract indicates any circumstance under which the IRA would be forfeitable to American Equity or anyone else. Instead, it specifies that the Cash Surrender Value is "always nonforfeitable," which satisfies the "unconditional . . . and legally enforceable against the plan" language of 29 U.S.C. § 1002(19). Although as much as 12.5% of the IRA may be subject to a surrender charge or penalty before the March 27, 2025, maturity date, this simply limits the amount Debtor can withdraw. It is not a limitation on her right to the IRA itself. There's no reason to believe, nor does Trustee argue, that Debtor's right to the IRA is not vested. Indeed, the IRA Contract indicates that she is free to withdraw funds at any time, subject to the applicable surrender charges.

Trustee has not cited and the Court has not found any caselaw supporting her conceptualization of forfeitability in terms of early surrender charges and penalties. Indeed, any such ruling would presumably be inconsistent with the Supreme Court's holding in *Nachman Corp*. For the reasons outlined above, the Court finds that the IRA satisfies § 408(b)(4).

---

[5] The capitalized terms are defined elsewhere in the IRA Contract.

MEMORANDUM OPINION -7

**Assignability**

Trustee next argues that the IRA fails to satisfy § 408(b)(1) because the IRA Contract is assignable and transferrable. She points to Section 3.3 entitled "Assignment," which outlines the parameters under which the IRA owner may assign her interest. The last sentence of the Section, however, includes a critical caveat: "Qualified contracts may not be transferred or assigned." The Court observes the immediately preceding paragraph entitled "Section 3.2 Ownership," which outlines a similar framework for the transfer of ownership of the IRA. It, too, includes the final sentence: "Qualified contracts may not be transferred or assigned." Although the term "Qualified" is not defined, Section 1.1 (entitled "Specifications") designates the tax status of the IRA as "Qualified."

Trustee asserts that, because the IRA Contract does not satisfy the nonforfeitability requirement of § 408(b)(4), it cannot be a qualified contract under § 408(b) and, as such, must therefore be assignable and transferrable. However, setting aside for a moment the Court's conclusion that the IRA is nonforfeitable, this argument ignores the fact that the IRA Contract defines the annuity as "Qualified" and specifies that qualified contracts cannot be transferred or assigned. Trustee's argument also makes the assumption that forfeitability and transferability/assignability go hand in hand; that one cannot exist without the other. There is nothing in the IRA Contract, nor has Trustee pointed to any legal authority, for that proposition. She cites to *In re Ludwig*, 345 B.R. 310, 317 (D. Co. 2006) and *In re Simpson*, 366 B.R. 64, 76 (9th Cir. BAP 2007), both of which reflect the statutory requirement that, to satisfy § 408(b), the annuity must not be transferrable. In *Ludwig*, the clear language of the contract gave the debtor the explicit right to change owners or assign it to another party. *Id*. 345 B.R. at 317. In *Simpson*, the debtor admitted that his annuity was not an IRS-qualified annuity, and the question before the court was whether it was a private retirement plan as defined by California law. *Id*. 366 B.R. at 76. Those cases are factually distinguishable from the one at bar and do not provide assistance in analyzing the question of whether the IRA is transferable. Rather, where the IRA Contract itself purports to address transfer and assignment rights, the Court looks to the contract to resolve the issue.

The court in *Neighorn v. Quest Health Care* provides guidance for contract interpretation:

> The normal rule of construction is that contracts must be interpreted, if possible, so as to avoid internal conflict. *A written contract must be read as a whole and every part interpreted with reference to the whole*, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. The plain language of the contract should be considered first whenever possible. *The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous*; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation.

870 F.Supp.2d 1069, 1096 (D. Or. 2012) (internal citations omitted) (emphasis added).

It appears from a plain reading of the IRA Contract that American Equity uses that contract form for both tax qualified and non-tax qualified annuities that it sells. In instances where contract rights for the former differ from the latter, the contract specifies when such rights do not apply to qualified contracts, as demonstrated in Sections 3.2 and 3.3. The parties do not need to look outside the contract itself to determine whether it is qualified because Section 1.1 outlines the specifications particular to the contract at issue. In this case, the IRA Contract issued to Debtor states that it is a Qualified contract. Aside from noting that the "Qualified" term is not defined, Trustee does not point to any ambiguity or inconsistency within the IRA Contract itself regarding that term or its application. And, indeed, the Court does not find any. As such, the Section 1.1 "Qualified" designation should be read together with the Sections 3.2 and 3.3 limitations on transfer and assignment of qualified contracts to mean that Debtor cannot transfer or assign the IRA. This reading comports with the letter dated June 27, 2017, from Ms. Henter at American Equity, which states that the contract pertains to a "Traditional IRA" and that it "cannot be transferred or assigned as it is a qualified contract." Trustee has not provided evidence to overcome the presumption of validity of the claimed exemption. The Court finds that the IRA satisfies § 408(b)(1).

**Initial Premium Payment**

Trustee's last argument focuses on the fact that the initial $84,915.15 purchase price for the IRA exceeds the $6,000 limitation imposed by §§ 408(b)(2)(B) and 219(b)(1)(A). Although she does not cite any caselaw in the premium payment section of her memorandum, she perhaps bases her position again on

*Ludwig* and *Simpson*, both of which involve annuities purchased in amounts that exceed the statutory limit. In *Ludwig*, the debtor purchased a $33,000 annuity with proceeds from a stock purchase program that he had previously placed into a brokerage account. 345 B.R. at 312. He did not offer evidence indicating that the stock ownership program was ERISA-qualified, nor did he offer evidence as to whether the placement of funds from the stock purchase program into the brokerage account constituted a "roll over" of funds. *Id*. at 312-13. The court ruled that the $33,000 purchase exceeded the applicable limit imposed by § 408(b)(2). *Id*. at 317. The debtor in *Simpson* purchased an annuity for $10,000. 366 B.R. at 67. There's nothing in the opinion to suggest that the purchase was made with anything other than cash. And, as noted above, the debtor conceded that the annuity was not an IRS-qualified annuity. *Id*. at 76.

      Debtor argues that the $6,000 limitation of § 219(b)(1)(A) is inapplicable in this context because the source of the funds used to purchase the IRA originated from her former husband's retirement accounts that were transferred to her pursuant to the General Judgment of Dissolution by operation of § 408(d)(6). She relies on *Running v. Miller (In re Miller)*, 778 F.3d 711 (8th Cir. 2015). In that case, before the debtor filed his bankruptcy petition, he transferred $267,319.48 from his individual retirement account as the purchase payment for a Minnesota Life Insurance Company annuity. *Id*. at 713. There was no dispute that the funds used by the debtor to purchase the annuity came from his individual retirement account, which was a qualified account under § 408(a). *Id*. at 713. When he filed his bankruptcy, he claimed an exemption in the annuity pursuant to 11 U.S.C. § 522(b)(3)(C).[6] *Id*. at 713. The question before the court was whether the $6,000 limit of § 219(b)(1)(A) applied to the initial purchase price such that the $267,319.48 rolled over from an otherwise tax-qualified retirement account rendered the resulting annuity non-exempt for bankruptcy purposes. *Id*. at 713-14.

      Ruling that the annuity satisfied § 408(b) and, by extension, 11 U.S.C. § 522(b)(3)(C), the Eighth Circuit emphasized the tax code's definition of "qualified retirement contribution," the operative term to

---

[6] The language in 11 U.S.C. § 522(b)(3)(C) is identical to that of 11 U.S.C. § 522(d)(12) and includes a reference to IRC § 408.

MEMORANDUM OPINION -10

which § 219(b)(1)(A) applies. *Id*. at 714. Section 219(e)(1) defines it as "any amount *paid in cash* for the taxable year . . . to an individual retirement plan." (emphasis added). The court reasoned:

> Section 219(b)(1)(A) thus concerns retirement contributions being made for the first time, not the disposition of retirement contributions that were made in the past. By incorporating this provision, § 408(b)(2)(B) connotes that its annual-premium limitation applies only to funds that are being contributed to an individual retirement annuity in the first instance. It therefore follows that the term "premium" in § 408(b) does not include funds that are taken from a qualified individual retirement account to purchase an individual retirement annuity.

*Id*. at 714 (internal citations omitted). The court further noted that § 408, by operation of subsection (d)(3) (defining "rollover contributions"), makes clear that a rollover contribution is distinct from a premium. *Id*. Because rollover contributions can be in any amount, a "premium," as the term is used in § 408(b)(2)(B), does not include funds from a qualified requirement account that are used to purchase an individual retirement annuity. *Id*. at 715.

      Although *Ludwig* and *Simpson* accurately reflect the requirements for satisfaction of §§ 408(b)(2)(B) and 219(b)(1)(A), the facts in this case more closely align with *Miller*. While the *Miller* court does not discuss § 408(d)(6), its analysis regarding § 408(d)(3) is particularly helpful in this case. Debtor's original annuity application; the June 5, 2017, letter from Ann Hefler, Service Technician for American Equity; the July 14, 2017, letter from Melanie Madden at Futurity First Insurance Group, Inc.; and the two Form 1099-Rs issued in 2015 from TransAmerica all support the conclusion that the funds in Debtor's 403(b) and 401(k) accounts with TransAmerica were directly rolled over into the IRA. Debtor also provided undisputed evidence showing that there were no new or additional contributions to the IRA after it was purchased. Trustee does not argue that the two accounts with TransAmerica were not tax-qualified individual retirement accounts under § 401 or § 403, nor does she assert that the transfers of the funds in those accounts into the IRA fail to satisfy § 408(d)(3). Given the evidence provided by Debtor and the presumption of validity afforded to debtors in the context of objections to claimed exemptions, the Court finds that Debtor's original purchase of the IRA with funds directly transferred from tax-qualified retirement accounts satisfies § 408(d)(3) and that the $6,000 limitation imposed by § 408(b)(2)(B) is inapplicable in this case.

MEMORANDUM OPINION -11

As noted above, Debtor points to § 408(d)(6) rather than § 408(d)(3) as the operative mechanism for the transfer of funds from the original accounts into the IRA and, by extension, the permitted departure from the $6,000 limit under § 408(b)(2)(B). She cites *Bunney v. C.I.R.*, 114 T.C. 259 (2000), a tax case highlighting the requirements of § 408(d)(6). Although the facts in *Bunney* are distinguishable from those in this case, the tax court emphasized that the statute requires a transfer of a participant's *interest* in a retirement account to his or her former spouse; a withdrawal of funds and subsequent payment to the former spouse is insufficient. *Id*. at 265.

In this case, the Judgment awards Debtor an interest in her former husband's retirement accounts and specifies that the transfer of Debtor's portion into a new account that she designates shall be done pursuant to § 408(d)(6). There is no issue regarding whether her ex-husband improperly withdrew the funds before transferring them to Debtor. However, the Court notes that the facts appear to be different from what Debtor asserts. Debtor states that, "[i]n accordance with the terms of the [Judgment], after her now ex-husband passed away in 2015, on March 16, 2015, debtor applied to open a retirement account with American Equity."[7] The Judgment, however, awards Debtor an interest in her husband's Asante 403(b) account and his Asante Retirement and Trust account, neither of which was the source of the funds used to purchase the IRA with American Equity. Neither party discusses this discrepancy, nor provides information regarding how or when the funds moved from Asante to TransAmerica. That said, the letter dated July, 14, 2017, from Melanie Madden specifies that the IRA with American Equity was purchased by a direct rollover of funds from the TransAmerica 403(b) and 401(k) accounts and that the TransAmerica accounts were funded pursuant to the Judgment.[8] Trustee did not object to admission of this letter into evidence and has not disputed the facts asserted therein. The record is sufficient for the Court to find that the transfer of funds

---

[7] MEMORANDUM IN SUPPORT OF DEBTOR'S CLAIMED EXEMPTION UNDER 11 U.S.C. § 522(D)(12) at 2 (Doc. #60; 7/21/17.

[8] Ms. Madden states: "I am writing this letter to explain the circumstances surrounding the funding of [the Debtor's IRA]. The original sources of these funds were as a QDRO, which created the accounts at TransAmerica . . . ."

MEMORANDUM OPINION -12

from Asante to TransAmerica satisfies § 408(d)(6). This appears to be where the application of § 408(d)(6) ends. The Court could perhaps imagine a scenario where the subsequent transfers of the accounts with TransAmerica into the IRA may also satisfy § 408(d)(6); however, as noted above, the factual record is insufficient for it to make such a finding. The Judgment does not contemplate successive transfers. Indeed, once the original funds were transferred from Debtor's ex-husband's accounts into an account that she designated, they became her funds. A subsequent transfer between two retirement accounts owned by Debtor could never, by definition, satisfy § 408(d)(6), which pertains only to transfers between spouses and former spouses.

## Conclusion

For the reasons outlined above, the Court finds that Trustee has not met her burden of proof. The IRA satisfies § 408(b) and, by extension, 11 U.S.C. § 522(d)(12). Trustee's Objection is overruled and the exemption is allowed. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Federal Rules Bankruptcy Procedure 7052. The Court will enter a separate order consistent with this opinion.

THOMAS M. RENN
Bankruptcy Judge